[L.A. 31487. Dec. 12, 1983.]

CELESTINO MARK CARLOS, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Wilbur F. Littlefield, Public Defender, Laurence M. Sarnoff, Dennis A. Fischer, Richard Santwier and Morton Borenstein, Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

John K. Van de Kamp, District Attorney, Harry B. Sondheim, Donald J. Kaplan and Maurice H. Oppenheim, Deputy District Attorneys, for Real Party in Interest.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, as Amici Curiae on behalf of Real Party in Interest, upon the request of the Supreme Court.

## OPINION

**BROUSSARD, J.**—The question before us is whether a defendant can be charged or convicted of murder with the special circumstance of felony murder under the 1978 death penalty initiative if he did not intend to kill or to aid in the commission of a killing. We approach that issue with due recognition of the importance of the matter. A finding of murder with special circumstances *requires* the trier of fact to choose between only two alternatives—death or life imprisonment without possibility of parole—the most severe punishments permitted under our law. The infliction of either punishment upon a person who did not intend a murder, but only some lesser crime, poses grave moral and legal issues. The ethical principles that punishment should be proportionate to individual guilt, and that a less culpable offender should not be punished more severely than a more culpable offender, permeate the criminal law and underlie constitutional protections.

Such principles, finding expression in statutory analysis and rules of construction, will ultimately determine the outcome of this case.

The question involves the interpretation of two provisions of Penal Code section 190.2, enacted as part of the 1978 initiative.[1] The first, paragraph 17 of subdivision (a), provides a penalty of death or life imprisonment without possibility of parole if the "murder was committed while the defendant was engaged in or was an accomplice in the commission . . ." of nine listed felonies, including robbery.[2] The second, subdivision (b), provides the same penalties for "[e]very person whether or not the actual killer found guilty of *intentionally* aiding, abetting, . . . or assisting any actor in the commission of [a] murder . . ." (italics added) falling within 18 listed special circumstances, including felony murder.[3] Thus, both provisions describe the punishment for felony murder, but neither makes clear whether an intent to kill is an essential element of the special circumstance; paragraph 17 is silent on that subject, subdivision (b) ambiguous.

In resolving the uncertainties of the statutory language, we have concluded that the 1978 initiative should be construed to require an intent to kill or to aid in a killing as an element of the felony murder special circumstance. To reach that conclusion, we first examined the language of the initiative and the manner in which it was presented to the voters; we found that the language and presentation were uncertain, but both tended to support an intent to kill requirement. We next considered applicable principles of statutory construction. One such principle, the general rule that ambiguities in penal statutes are resolved in favor of the defendant, acquires much greater

---

[1]All statutory citations in this opinion are to the Penal Code.

[2]Section 190.2, subdivision (a) states: "(a) The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in state prison for a term of life without the possibility of parole in any case in which one or more of the following special circumstances has been charged and specially found under Section 190.4, to be true: . . . [¶] (17) The murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission or the immediate flight after committing or attempting to commit the following felonies: [¶] (i) Robbery in violation of Section 211. [¶] (ii) Kidnapping in violation of Sections 207 and 209. [¶] (iii) Rape in violation of Section 261. [¶] (iv) Sodomy in violation of Section 286. [¶] (v) The performance of a lewd or lascivious act upon person of a child under the age of 14 in violation of Section 288. [¶] (vi) Oral copulation in violation of Section 288a. [¶] (vii) Burglary in the first or second degree in violation of Section 460. [¶] (viii) Arson in violation of Section 447. [¶] (ix) Train wrecking in violation of Section 219."

[3]Section 190.2, subdivision (b) provides that "[e]very person whether or not the actual killer found guilty of intentionally aiding, abetting, counseling, commanding, inducing, soliciting, requesting, or assisting any actor in the commission of murder in the first degree shall suffer death or confinement in state prison for a term of life without the possibility of parole, in any case in which one or more of the special circumstances enumerated in paragraphs (1), (3), (4), (5), (6), (7), (8), (9), (10), (11), (12), (13), (14), (15), (16), (17), (18), or (19) of subdivision (a) of this section has been charged and specially found . . . to be true."

force in cases involving the felony-murder doctrine—a doctrine often criticized as imposing punishment disproportionate to culpability and for that reason strictly construed by the courts. Another principle requires us to construe statutes to avoid serious constitutional questions. A statute which threatens to impose the death penalty, or life without possibility of parole, upon a defendant who did not intend to kill, while permitting some deliberate killers to escape with lesser punishment, might on its face violate the cruel and unusual punishment or equal protection clauses. At a minimum, such a statute could not constitutionally be applied to many of the cases falling within its terms. The various principles of construction thus unite to impel an interpretation which finds an intent to kill requirement in the felony murder provision of the 1978 initiative.

In the present case, defendant Celestino Carlos seeks a writ of prohibition to bar his trial on a special circumstance allegation on the ground that the evidence failed to show that he intended to kill or to aid a killing.[4] According to the evidence presented at the preliminary hearing, defendant and Manuel Perez robbed a grocery store. Upon leaving the store, they were confronted by Gerald Slagle, a deputy sheriff. Slagle's daughter, the murder victim, was fatally wounded in a gun battle between Slagle and Perez. Defendant, however, left the scene before the shooting started, retrieved his car, and returned to help Perez escape. Since nothing in this evidence suggests that defendant intended a killing, the writ should issue barring his trial on the special circumstance allegation.

## I. *Proceedings in the present case.*

Defendant and Manuel Perez were arrested for robbery and murder.[5] Following a preliminary hearing, the prosecutor filed a five-count information against defendant. Count I, the only count relevant to the present proceeding, charged defendant with the murder of Jennifer Slagle, and alleged as a

---

[4] A number of appeals pending before this court present the question whether intent to kill is required for felony murder special circumstances under the 1978 law. Some cases involve accomplices; others involve defendants who actually killed a victim but claim they intended no harm, intended only to injure, or lacked mental capacity to intend to kill. According to the way the 1978 initiative is worded, all of these cases present the same basic issue of statutory interpretation. Because the present case arises on pretrial writ, avoiding extraneous issues raised in the postconviction appeals, we have selected it as the most suitable one in which to address that issue.

[5] Codefendant Perez was tried separately, convicted of first degree murder with the special circumstance of felony murder, and sentenced to life imprisonment without possibility of parole. On appeal, the court upheld the conviction but reversed for additional proceedings on the special circumstance allegation, holding that the jury must be instructed that it could not find the special circumstance of felony murder unless it found that one of the robbers fired the fatal bullet. (*People* v. *Perez* (2 Crim. 38480).) We granted a petition for hearing. The case is pending before this court (Crim. No. 22820).

special circumstance that the murder was committed by defendant and Perez while both were engaged in or were accomplices in the commission of robbery and the immediate flight after committing robbery. (§ 190.2, subd. (a) [¶] (17).) At the preliminary hearing, the prosecutor presented the following evidence in support of that count:

On November 17, 1979, two men stopped at the entrance of a Safeway store in La Crescenta. Before entering the store, one man, identified as defendant, pulled a ski mask over his face. At the same time, Gerald Slagle, an off-duty reserve deputy sheriff, was walking toward the Safeway store with his three-year-old daughter, Jennifer. He saw the two men walk past him and noticed that just before they entered the store, one man pulled a ski mask over his face and drew a gun. Concluding that a robbery was about to occur, Slagle took his daughter, crouched down behind a car in the parking lot, and waited for the men to emerge.

Upon entering the store, defendant, the man in the ski mask, approached a grocery clerk and directed her at gunpoint to put money in a paper bag. Perez, the unmasked robber, approached another clerk with what appeared to be a sawed-off shotgun. After the clerks put money into paper bags, defendants took the bags and left the store.

When the two robbers reached an area clear of bystanders, Slagle confronted them. While defendant fled, Perez aimed his gun at Slagle. Slagle fired two shots at Perez, wounding him. Perez then shot at Slagle, who ducked behind the car, and the two men continued to exchange fire. At some point in the shooting Jennifer Slagle stood up and was hit by two bullet fragments. Shortly thereafter, defendant arrived with a car; Perez got in and the two men drove off.

Jennifer Slagle died from a gunshot wound to the head. A chemical analysis of a bullet fragment suggested that the fatal shot probably came from Slagle's gun.

Contending that the foregoing evidence did not show that he intended to kill or to aid in a killing, defendant moved pursuant to Penal Code section 995 to set aside the special circumstance allegation.[6] (See *Ramos* v. *Superior Court* (1982) 32 Cal.3d 26 [184 Cal.Rptr. 622, 648 P.2d 589]; *Ghent* v. *Superior Court* (1979) 90 Cal.App.3d 944 [153 Cal.Rptr. 720].) The superior court denied the motion, and defendant sought review by writ of prohibition.

---

[6]Defendant does not challenge the murder charge itself.

II. *The felony murder special circumstance under the 1978 death penalty initiative.*

(A) *The felony-murder rule in California prior to the 1978 initiative.*

■ Apart from its effect in capital cases, the felony-murder rule in California serves two purposes. First, whenever a killing occurs as a direct causal result of the commission or attempt to commit a felony inherently dangerous to human life, the rule classifies the killing as murder instead of manslaughter. (See *People* v. *Nichols* (1970) 3 Cal.3d 150, 163 [89 Cal.Rptr. 721, 474 P.2d 673]; *People* v. *Phillips* (1966) 64 Cal.2d 574, 582 [51 Cal.Rptr. 225, 414 P.2d 353].) It thus dispenses with the need to prove malice aforethought. (*People* v. *Dillon* (1983) 34 Cal.3d 441, 472-476 [194 Cal.Rptr. 390, 668 P.2d 697].) Second, whenever the felony is one listed in section 189, the rule classifies the murder as one of the first degree. In this context, felony murder substitutes for proof of premeditation. (See *People* v. *Cantrell* (1973) 8 Cal.3d 672, 688 [105 Cal.Rptr. 792, 504 P.2d 1256].)

California law prior to *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880] granted a penalty jury uncontrolled discretion to determine whether a defendant convicted of first degree murder should be sentenced to death or life imprisonment. It drew no distinction between felony murders and other first degree murders. When the 1977 Legislature set out to restore the death penalty in California, however, it faced the task of complying with United States Supreme Court decisions (*Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726]; *Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909]) which required a state to establish standards to guide the discretion of the jury. (*Gregg, supra,* 428 U.S. at p. 189 [49 L.Ed.2d at p. 883] (opn. of Stewart, Powell and Stevens, JJ.).) The Legislature responded by limiting the punishments of death and life imprisonment without possibility of parole to cases presenting one or more "special circumstances." Absent a finding of special circumstances, the maximum penalty provided is life imprisonment with possibility of parole.

In formulating its list of special circumstances, the 1977 Legislature decided in essence that a murder which qualified as a first degree murder both because it was a deliberate, premeditated killing and because it fell under the felony-murder doctrine was the kind of aggravated murder which might warrant the death penalty. It therefore provided that a first degree murder conviction should be punished by death or life imprisonment without possibility of parole if "[t]he murder was willful, deliberate, and premeditated and was committed during the commission or attempted commission of any

of the following crimes . . .": robbery, kidnaping, rape, child molesting, and burglary with intent to commit larceny or rape. (Former § 190.2, subd. (c)(3).) This special circumstance under the 1977 law was carefully defined and limited; it applied only if "[t]he defendant was personally present during the commission of the act or acts causing death, and with intent to cause death physically aided or committed such act or acts causing death . . . ." (Former § 190.2, subd. (c).) The Legislature further provided that "the defendant shall be deemed to have physically aided in the act or acts causing death only if it is proved beyond a reasonable doubt that his conduct constitutes an assault or a battery upon the victim or if by word or conduct he orders, initiates, or coerces the actual killing of the victim." (Former § 190.2, subd. (d).)

Our decision in *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468] explained the felony murder special circumstance of the 1977 law: "[W]e infer that the purpose of the Legislature was to comply insofar as possible with what it understood to be the mandate of *Furman* and *Gregg* et al. At the very least, therefore, the Legislature must have intended that each special circumstance provide a rational basis for distinguishing between those murderers who deserve to be considered for the death penalty and those who do not. The Legislature declared that such a distinction could be drawn, inter alia, when the defendant committed a 'willful, deliberate and premeditated' murder 'during the commission' of a robbery or other listed felony. (Former § 190.2, subd. (c)(3).) The provision thus expressed a legislative belief that it was not unconstitutionally arbitrary to expose to the death penalty those defendants who killed in cold blood in order to advance an independent felonious purpose, e.g., who carried out an execution-style slaying of the victim of or witness to a holdup, a kidnaping, or a rape." (P. 61; fn. omitted.)

In short, the 1977 law viewed felony murder as a special circumstance only in the case of a defendant, physically present at the crime scene, who intentionally commits or aids a deliberate and premeditated murder. Our decision in *Green* implicitly acknowledged classification of such felony murders to be a proper exercise of the Legislature's power to distinguish between those defendants whose conduct might warrant the death penalty and other defendants, equally guilty of first degree murder, for whom that penalty would be excessive.

(B) *The text of the 1978 initiative.*

The 1978 initiative, enacted by the voters at the November election of that year, completely rewrote the special circumstance provision of the 1977 law. In place of the six narrowly defined circumstances of the earlier

legislation, it enacted 19 special circumstances. The felony-murder provision (now ¶ 17 of § 190.2, subd. (a)) omitted any requirement that the murder be wilful, deliberate, and premeditated. Instead, it provided a punishment of death or life imprisonment without possibility of parole if "[t]he murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit" any listed felony. To the five felonies specified in the 1977 law—robbery, kidnaping, rape, child molesting, and burglary—it then added four additional crimes—forceable sodomy, forceable oral copulation, arson, and trainwrecking.

The provisions in the 1977 law requiring physical presence and intention to cause death also disappear from the 1978 version. In their place appears a new section (190.2, subd. (b)), of uncertain effect, but apparently designed to equate the liability of actual killers and their accomplices. This section, which by its terms applies to all special circumstances except that of previous murder conviction (§ 190.2, subd. (a), ¶ (2)), states that "[e]very person whether or not the actual killer found guilty of intentionally aiding, abetting, counseling, commanding, inducing, soliciting, requesting, or assisting any actor in the commission of murder in the first degree shall suffer death or confinement in state prison for a term of life without the possibility of parole . . . ."

In paragraph 17 of the new enactment, the felony murder special circumstance, the absence of any express requirement of intentionality suggests that the circumstance applies to a defendant whether or not he intended to kill. That inference gains force from the fact that 10 of the 18 remaining special circumstances expressly require an intentional killing, implying that the omission of that requirement in paragraph 17 was deliberate.[7]

Upon closer look, however, it becomes clear that a construction of paragraph 17 without an intent requirement would have anomalous results. Five

---

[7]The following special circumstances require an intentional killing: murder for financial gain (¶ 1), murder of a police officer (¶ 7), murder of a federal law enforcement officer (¶ 8), murder of a fireman (¶ 9), murder of a witness (¶ 10), murder of an elected or appointed official (¶ 13), murder while lying in wait (¶ 15), murder for racial or similar motives (¶ 16), murder by torture (¶ 18), and murder by poison (¶ 19). Two other circumstances, both involving use of a destructive device (¶¶ 4 and 6), require that defendant know or should know his act would create a great risk of death.

The reasoning behind this pattern is difficult to discern. It is not immediately apparent why the initiative requires an intentional killing if the victim is a policeman, fireman, or witness, but not if the victim is a prosecutor (¶ 11) or judge (¶ 12). Neither is it clear why the initiative inserted no intent requirement for a murder done to escape arrest or custody (¶ 5). While it might be argued that a murder "committed for the purpose [of] escape" (¶ 5) implies an intentional killing, the same argument would apply to many other special circumstances for which the initiative supplied an express requirement of intent.

of the felonies listed in that paragraph—arson, rape, robbery, burglary and child molesting—also appear in section 189, the statutory felony-murder provision.[8] As to these offenses, an unintentional killing in perpetration of the felony, raised to first degree murder by operation of section 189, would without further proof constitute a special circumstance under paragraph 17. The remaining four felonies—kidnaping, sodomy, oral copulation, and trainwrecking—are not enumerated in section 189. Since it is clear that in virtually every case an intent to kill would be required to render a death occurring in the course of one of these four felonies a first degree murder— a prerequisite to any special circumstance finding (§ 190.2, subd. (a))—a defendant who kills unintentionally during the commission of those offenses is not subject to the death penalty or imprisonment without possibility of parole.[9]

There is, however, no reason to believe that the drafters or voters intended to distinguish between deaths which occurred during the course of section 189 felonies and those in nonsection 189 felonies; the two classes of felonies are interspersed randomly in paragraph 17. And the result of such a distinction would be difficult to defend. A defendant who killed unintentionally during a robbery or rape could be convicted of first degree murder with special circumstances and executed, while one who killed unintentionally during a kidnaping for robbery or a forcible sodomy could not be convicted of first degree murder and thus could not be executed.

The difficulties created by reading paragraph 17 without an intentionality requirement increase when we consider subdivision (b) of section 190.2. Although that subdivision apparently was added to govern liability of accomplices, it states the liability of both accomplices and principals. "Every person whether or not the actual killer" shall suffer death or life imprisonment without possibility of parole if he is "found guilty of intentionally

---

[8]Section 189 states that "[a]ll murder which is perpetrated by means of a destructive device or explosive, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree; and all other kinds of murders are of the second degree."

For some unexplained reason, while a killing in the course of the commission of mayhem is first degree murder under section 189, mayhem is the only section 189 crime not listed as a special circumstance felony in paragraph 17.

[9]Trainwrecking is something of a special case. Under section 219, when any person suffers death as a proximate result of an intentional trainwrecking, the offender is subject to death or life imprisonment without parole. Section 219, however, does not declare the crime to be first degree murder. If the trainwrecker did not intend to kill, he might still be subject to death or life imprisonment without possibility of parole under the terms of section 219; he would not be subject to those penalties under paragraph 17, however, because that paragraph applies only to persons convicted of first degree murder and a trainwrecker who did not intend to kill would be guilty at most of second degree murder.

aiding, abetting . . . or assisting any actor in the commission of murder in the first degree" within the scope of 18 special circumstance paragraphs, including paragraph 17.

With regard to most of the listed special circumstances, the function of subdivision (b) is clear: it renders the accomplice equally liable as the principal if the accomplice "intentionally" aided in the murder. With respect to paragraph 17, however, its function is more obscure. In the first place, paragraph 17, alone of the listed paragraphs, already contains language equating the liability of principal and accomplice. In addition, the requirement that the accomplice "intentionally" aid in the commission of a murder is inherently ambiguous when applied to a felony murder, for it could mean either that the accomplice must intentionally aid in a killing, or that he need only intentionally aid the commission of the underlying felony. And because paragraph 17 includes felonies not listed in section 189, the ambiguities mount. Must the accomplice to a nonsection 189 felony share the principal's intent to kill, or need he only intend to aid the underlying felony?[10]

In resolving these ambiguities, we arrive at the following conclusion: With regard to section 190.2 generally, it is reasonably clear that subdivision (b) imposes an intent to kill requirement before an accomplice can be found guilty of murder with special circumstances under most of the special circumstance paragraphs. The subdivision further equates the liability of the accomplice to that of the actual killer, thus implying an intentionality requirement for the actual killer—a requirement stated expressly in some, but not all, of the paragraphs in question.

With regard to felony murder, the impact of subdivision (b) is less clear. It almost certainly imposes an intent to kill requirement for an accomplice to any nonsection 189 murder, since the actual killer in such a case could not be found guilty of murder with special circumstances absent such an intent. Since subdivision (b) draws no distinction between section 189 murders and those not encompassed in that section, and seeks to avoid any distinction between accomplices and actual killers, a uniform and sensible interpretation of the subdivision would read it as imposing an intent to kill requirement for the accomplice to any felony murder, and by implication such a requirement for the actual killer himself.

---

[10]A further problem arises from subdivision (b)'s concept of an "actual killer found guilty of intentionally aiding . . . any actor in the commission of murder in the first degree." There would not appear to be any purpose in distinguishing between actual killers who kill in concert with others and those who act alone.

The statutory language is also inconsistent with the verdict form employed in murder cases, which ordinarily would not reveal whether a defendant was found guilty as an actual killer acting alone, an actual killer who also assisted another culprit, or an accomplice.

We cannot demand perfection in the drafting of statutes; some inconsistency and inequity is probably inevitable. But neither should we ignore such matters when called to our attention. If, as in this case, we can discover a reasonable interpretation of the statute which avoids logical anomalies and minimizes inequitable results, surely we would prefer that interpretation to one that does not.

(C) *History and purpose of the 1978 initiative.*

In construing an initiative measure, the California courts have often referred to the analysis and arguments in the voters' pamphlet as an aid to ascertaining the intention of the framers and the electorate.[11] (*Carter* v. *Com. on Qualifications, etc.* (1939) 14 Cal.2d 179, 185 [93 P.2d 140]; see *White* v. *Davis* (1975) 13 Cal.3d 757, 775, fn. 11 [120 Cal.Rptr. 94, 533 P.2d 222] and cases there cited.) In the present instance, the analysis by the Legislative Analyst of the 1978 death penalty initiative (Prop. 7 Nov. 1978 ballot) merely reiterates an abridged version of the initiative, and extends no assistance as to the meaning of any ambiguous terms. The argument advanced by the proponents, however, offers some clues.

The 1978 initiative repealed provisions of the 1977 act requiring physical presence and a wilful, deliberate, and premeditated killing before the jury could find a felony murder special circumstance. ██ ██ The deletion of an express statutory provision implies an intent to change the substantive law (see, e.g., *Clements* v. *T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 231-232 [273 P.2d 5]); the repeal of language requiring that the defendant act "with the intent to cause death" (former § 190.2, subd. (b)) thus implies a purpose to permit a special circumstance finding without proof of intent.

The ballot arguments, however, communicated a contrary purpose. The proponents' initial argument referred obliquely to eliminating the physical presence requirement, but made no reference to eliminating the intent to

[11]One difficulty with relying on ballot arguments is that they are stronger on political rhetoric than on legal analysis. For example, the proponents of the 1978 initiative asserted that "[i]f you were killed on your way home tonight simply because the murderer was high on dope and wanted the thrill, that criminal would not receive the death penalty. Why? Because the Legislature's weak death penalty law does not apply to every murderer. Proposition 7 would."

The statement is doubly misleading. Proposition 7 did not and could not constitutionally render every murderer subject to the death penalty. Only those murders attended with special circumstances can be punished by death, and "thrill killing" is not a special circumstance. On the facts stated, the murderer in question would probably not be eligible for the death penalty.

kill requirement.[12] Their argument in rebuttal strongly implied that the initiative, in subdivision (b), retained an intent to kill requirement.

The opponents of the initiative charged that Proposition 7 could be construed to impose the death penalty for an unintended killing. They claimed that "a man or woman could be sentenced to die for lending another person a screwdriver to use in a burglary, if the other person accidentally killed someone during the burglary. Even if the man or woman was not present during the burglary, had no intention that anyone be killed or hurt, in fact urged the burglar not to take a weapon along, they could still be sentenced to die."

In rebuttal to that charge, the proponents responded: "ALRIGHT, LET'S TALK ABOUT FALSE ADVERTISING. [¶] The opposition maintains if someone were to lend a screwdriver to his neighbor and the neighbor used it to commit a murder, the poor lender could get the death penalty, even though 'he had NO INTENTION that anyone be killed.' [¶] Please turn back and read Section 6b [now § 190.2, subd. (b)] . . . . It says that the person must have INTENTIONALLY aided in the commission of a murder to be subject to the death penalty under this initiative."

This rebuttal is our best evidence of the intent of the drafters and the voters. In the hypothetical case it discusses, the "poor lender" had intentionally aided in the commission of a burglary, a section 189 felony. Thus, in proclaiming that the term "intentionally aiding . . . in the commission of murder" in subdivision (b) bars imposition of the death penalty upon the lender, the proponents are necessarily construing that term to require an intent to kill, not merely an intent to commit the underlying felony. In short, it apparently was the intent of the framers—an intent which they emphati-

---

[12]The paragraph asserts that "[i]f Charles Manson were to order his family of drug-crazed killers to slaughter your family, Manson would not receive the death penalty. Why? Because the Legislature's death penalty law does not apply to the master mind of a murder such as Manson. Proposition 7 would." Since the reason the prior law might not apply to this hypothetical case is that the 1977 law required that the defendant be "personally present during the commission of the act or acts causing death" (former § 190.2, subd. (c)), this argument may explain why that requirement was repealed in the 1978 law.

An article by Donald Heller, one of the authors of the argument in favor of Proposition 7, confirms this explanation of the "Manson argument." Writing in the Los Angeles Times (Oct. 22, 1978, § 4, p. 3), he states that "[t]he present law has . . . been criticized as inadequate by many responsible law-enforcement officials because a defendant must now be physically present during the commission of the act causing death and, in addition, must actually aid or commit the acts causing death to be charged with murder. Indeed, in a diabolical situation in which one individual, such as a Charles Manson, systematically plans the murder of innocent victims but orders without promise of payment someone else to carry out the scheme—and thus does not personally attend the sordid ceremonies—only the killer, not the planner, would be subject to the death penalty."

cally communicated to the voters—that an accomplice would face the death penalty only if he intentionally aided a killing.

The hypothetical case focused on the liability of the accomplice; the unfortunate "other person" who "accidentally killed someone during a burglary" received only the briefest mention. The rebuttal, however, expressly derived its intentionality requirement from section 6b of the initiative, and if the voter turned for clarification to the specific language of that section, he would have found that it was not limited to accomplices but applied to "[e]very person" including "the actual killer."

The adoption of a law to permit infliction of the death penalty upon an accidental killer would be a momentous step, raising grave moral questions. Nothing in the ballot arguments suggested that the framers intended to take such a step; certainly nothing communicated any such intention to the voters.[13] We conclude that the history of the initiative, as well as its wording, supports a construction limiting the felony murder special circumstances to persons who intend to kill or aid in a killing.

(D) *Interpretation of penal statutes.*

■ In *ex parte Rosenheim* (1890) 83 Cal. 388, 391 [23 P. 372], the court explained that "[w]hile it is true, the rule of the common law that penal statutes are to be strictly construed has been abrogated by the code, which provides that 'all its provisions are to be construed according to the fair import of their terms, with a view to effect its object and promote justice,' it is also true that the defendant is entitled to the benefit of every reasonable doubt, whether it arise out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute . . . ." The California courts thereafter have adhered to the rule that a reasonable doubt concerning the meaning of a penal statute should be resolved in favor of the defendant. Thus, in *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617], we declared that "[i]t is the policy of this state to construe a penal statute as favorably to the defendant as its language and the circumstances of its application may reasonably permit . . . ." In construing a different provision of the same 1978 initiative before us in the present case, *People* v. *Spears* (1983) 33 Cal.3d

---

[13]The Attorney General cites the proponents' claim that the 1978 initiative "will give every Californian the protection of the nation's toughest, most effective death penalty law." He argues that the enactment of the initiative shows the voters wanted a "tough" law, and, in essence, that the "toughest" death penalty law is the one which threatens to inflict that penalty on the maximum number of defendants. (Whether it would be the most "effective" death penalty law is another question.) But there is a considerable gap between such generalities and voter endorsement of the deletion of an intent to kill requirement in the felony murder special circumstance.

279, 283 [188 Cal.Rptr. 454, 655 P.2d 1289] reiterated "the rule that a defendant is entitled to the benefit of any reasonable doubt as to the construction of a penal law."

That rule of construction acquires heightened force in felony-murder cases. Courts and commentators have consistently criticized the felony-murder doctrine as unjust, imposing punishment with little regard for culpability. (See *People* v. *Phillips, supra,* 64 Cal.2d 574, 582-583; Fletcher, *Reflections on Felony-Murder* (1981) 12 Sw.U.L.Rev. 413.) They also question its utility. As one commentator observed, "[i]t may be that the rule is unnecessary in almost all cases in which it is applied, that is to say, that conviction in those cases can be predicated on the normal rules as to murder and as to accomplice liability. In the small residuum of cases, there may be substantial question whether the rule reaches a rational result or does not at least distract attention from more relevant criteria." (Fn. omitted.) (Packer, *The Case for Revision of the Penal Code* (1961) 13 Stan.L.Rev. 252, 259.)

■ In *People* v. *Satchell* (1971) 6 Cal.3d 28 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383], Justice Sullivan summarized the judicial view of the felony-murder rule: "In the case of *People* v. *Washington* (1965) 62 Cal.2d 777, at page 783 [44 Cal.Rptr. 442, 402 P.2d 130], this court struck the keynote which has guided all our subsequent consideration of cases involving the felony-murder doctrine. Acknowledging the substantial body of legal scholarship which has concluded that that doctrine not only 'erodes the relation between criminal liability and moral culpability' but also is usually unnecessary for conviction, we went on to say of it: 'Although it is the law in this state (Pen. Code, § 189), *it should not be extended beyond any rational function that it is designed to serve.*' (Italics added.) [¶] Applying this principle to various concrete factual circumstances, we have sought to insure that the 'highly artificial concept' (*People* v. *Phillips* (1966) 64 Cal.2d 574, 582 [51 Cal.Rptr. 225, 414 P.2d 353]) of strict criminal liability incorporate in the felony-murder doctrine be given the narrowest possible application consistent with its ostensible purpose—which is to deter those engaged in felonies from killing negligently or accidentally (see *People* v. *Washington, supra,* 62 Cal.2d 777, 781, and authorities there cited)." (Pp. 33-34, fn. omitted.)

The felony-murder rule in the cited cases served to distinguish among felons, punishing as murderers those who, although intending only some lesser felony, encountered an unintended killing. ■ The rule in the present case serves a new purpose: to determine which murderers deserve death or life imprisonment without possibility of parole. In this context the cited criticisms acquire renewed strength. To impose a penalty of death or perpetual confinement for a killing, without taking account of whether the

defendant intended to kill, is plainly to impose liability regardless of culpability. An intent to kill requirement would still permit such punishment for willful killing during the commission of a felony; to go beyond that would appear to extend the rule *"beyond any rational function that it is designed to serve."* (*People* v. *Satchell, supra,* 6 Cal.3d 28, 34.)

Rules of construction resolving doubts in favor of the defendant and limiting the application of the felony-murder rule come into play only when the language and purpose of the enactment are uncertain. We have already seen that the language of the 1978 initiative and the purpose of its enactment as explained to the voters indicates, but does not compel, the conclusion that intent to kill is required. In such a setting the use of these rules of construction is appropriate, and serves to reinforce our view that the statute does not permit punishment of an unintentional felony murder by death or life imprisonment without possibility of parole.

(E) *Interpretation to avoid questions of constitutional validity.*

Both the United States Supreme Court and the California courts have pointed out on numerous occasions that a court, when faced with an ambiguous statute that raises serious constitutional questions, should endeavor to construe the statute in a manner which *avoids* any doubt concerning its validity.[14] (See, e.g., *Lynch* v. *Overholser* (1962) 369 U.S. 705, 710-711 [8 L.Ed.2d 211, 215-216, 82 S.Ct. 1063]; *United States* ex rel. *Atty. Gen.* v. *Delaware & Hudson Co.* (1909) 213 U.S. 366, 407-408 [53 L.Ed. 836, 848-849, 29 S.Ct. 527]; *People* v. *Davis* (1981) 29 Cal.3d 814, 829 [176 Cal.Rptr. 521, 633 P.2d 186]; *Department of Corrections* v. *Workers' Comp. Appeals Bd.* (1979) 23 Cal.3d 197, 207 [152 Cal.Rptr. 345, 589 P.2d 853]; *Kramer* v. *Municipal Court* (1975) 49 Cal.App.3d 418, 424 [122 Cal.Rptr. 672]; *White* v. *Valenta* (1965) 234 Cal.App.2d 243, 249 [44 Cal.Rptr. 241, 13 A.L.R.3d 1271].) In *United States* v. *Delaware & Hudson Co., supra,* the Supreme Court explained the scope and the rationale of this established canon of constitutional adjudication: "It is elementary when the constitutionality of a statute is assailed, if the statute be reasonably susceptible of two interpretations, by one of which it would be unconstitutional and by the other valid, it is our plain duty to adopt that construction which will save the statute from constitutional infirmity. [Citation.] And unless this rule be considered as meaning that our duty is to first decide that a statute is unconstitutional and then proceed to hold that such ruling was

---

[14]As the dissenting opinion observes, if defendant were to contend that the 1978 initiative was unconstitutional as applied to other persons but not as to defendant himself, his standing to raise that contention would be open to question. Defendant, however, calls our attention only to constitutional issues which bear upon the proper construction of section 190.2, and since this construction will affect defendant himself, no problem of standing arises.

unnecessary because the statute is susceptible of a meaning, which causes it not to be repugnant to the Constitution, *the rule plainly must mean that where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.*" (213 U.S. at pp. 407-408 [53 L.Ed. at p. 849]; italics added.)

■■■  The 1978 initiative, if construed to eliminate any intent to kill requirement for the felony murder special circumstance, would encounter substantial constitutional problems. As we will explain, application of the statute as so construed to accomplices who did not intend to kill would in many cases violate the federal cruel and unusual punishment clause.[15] Its application to an actual killer who did not intend to kill would present a close and unsettled constitutional question. In addition, a statutory classification which imposed a minimum penalty of death or imprisonment without parole upon persons who did not intend to kill, while permitting some deliberate killers to escape with a sentence of life with possibility of parole, would raise further constitutional questions: whether the statute complies with Supreme Court decisions requiring the screening of murder cases to select out those most deserving of enhanced punishment, and whether its classification conforms to constitutional standards of equal protection.

The United States Supreme Court decision in *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368], guides our analysis of the constitutionality of the 1978 initiative under the federal Constitution. The facts of that case closely resemble the instant case. While Enmund waited in a car, his two codefendants approached the residence of Thomas and Eunice Kersey. When they demanded money from Thomas, Eunice shot and wounded one of the codefendants. The codefendants then killed the Kerseys, took some money, and fled with Enmund in the car. Enmund was convicted of first degree murder with the aggravating circumstance that the felony was committed while Enmund was engaged in or an accomplice to robbery. He was then sentenced to death. The United States Supreme Court held that the death sentence violated the cruel and unusual punishment clause of the Eighth Amendment.

■■  In *Coker* v. *Georgia* (1977) 433 U.S. 584 [53 L.Ed.2d 982, 97 S.Ct. 2861], the court established the doctrine that "punishment is 'excessive' and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion

---

[15]We need not decide whether article I, section 27 of the California Constitution precludes analysis of this issue under the California cruel or unusual punishment clause (art. I, § 17).

to the severity of the crime." (P. 592 [53 L.Ed.2d at p. 989].) (Plurality opn. of White, J.)[16] In the *Enmund* case, the court applied both tests. With respect to proportionality, it examined the judgments of legislatures and of juries, finding that only nine states, including California, authorize the death penalty for an accomplice to robbery (458 U.S. at pp. 789-793 [73 L.Ed.2d at pp. 1146-1149, 102 S.Ct. at pp. 3372-3374]), and in those states juries have consistently repudiated imposition of the death penalty for crimes such as Enmund's. (458 U.S. at pp. 794-796 [73 L.Ed.2d at pp. 1149-1151, 102 S.Ct. at p. 3375].) Such judgments, the court concluded, conform to the principle that " 'causing harm intentionally must be punished more severely than causing harm unintentionally.' " (458 U.S. at p. 798 [73 L.Ed.2d at p. 1152, 102 S.Ct. at p. 3377], quoting Hart, Punishment and Responsibility (1968) p. 162.)

■ Turning to the question of the purpose of punishment, the court observed that " '[t]he death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders' " (458 U.S. at p. 798 [73 L.Ed.2d at p. 1152, 102 S.Ct. at p. 3377], quoting *Gregg* v. *Georgia, supra,* 428 U.S. 153, 183 [49 L.Ed.2d 859, 880]). A death penalty which failed to serve either purpose would be unconstitutional. But the imposition of the death penalty upon one who does not intend to kill, the court said, serves no purpose of deterrence, "for if a person does not intend that life be taken or contemplate that lethal force will be employed by others, the possibility that the death penalty will be imposed for vicarious felony murder will not 'enter into the cold calculus that precedes the decision to act.' " (458 U.S. at p. 799 [73 L.Ed.2d at p. 1153, 102 S.Ct. at pp. 3377-3378].)[17] Neither does it serve the purpose of retribution, for that purpose requires punishment proportional to culpability, and "[p]utting Enmund to death to avenge two killings that he did not commit and had no intention of committing or causing does not measurably contribute to the retributive end of ensuring that the criminal gets his just deserts." (458 U.S. at p. 801 [73 L.Ed.2d at p. 1154, 102 S.Ct. at p. 3378].) The court concluded that to impose the death penalty upon a

---

[16]For a detailed analysis of this doctrine as applied to felony murder—an analysis that anticipated the *Enmund* decision, see Comment, *The Constitutionality of Applying the Death Penalty for Felony Murder* (1978) 15 Hous.L.Rev. 356.

[17]"It would be very different," the court observed, "if the likelihood of a killing in the course of a robbery were so substantial that one should share the blame for the killing if he somehow participated in the felony. But competent observers have concluded that there is no basis in experience for the notion that death so frequently occurs in the course of a felony for which killing is not an essential ingredient that the death penalty should be considered as a justifiable deterrent to the felony itself. . . . In addition to the evidence that killings only rarely occur during robberies is the fact, already noted, that however often death occurs in the course of a felony such as robbery, the death penalty is rarely imposed on one only vicariously guilty of the murder, a fact which further attenuates its possible utility as an effective deterrence." (458 U.S. at pp. 799-800 [73 L.Ed.2d at p. 1153, 102 S.Ct. at p. 3378], fns. omitted.)

defendant "in the absence of proof that [he] killed or attempted to kill, and regardless of whether [he] intended or contemplated that life would be taken" would constitute cruel and unusual punishment in violation of the Eighth Amendment. (458 U.S. at p. 801 [73 L.Ed.2d at p. 1154, 102 S.Ct. at p. 3379].)

Although there are factual differences between *Enmund* and the present case, they are insufficient to distinguish that decision. Enmund waited in the getaway car; defendant participated in the robbery. Defendant was armed; we do not know if Enmund was. But the similarities between the two cases are controlling. Defendant did not kill, did not attempt to kill, and was not present at the time of the killing. Nothing in the record suggests that he intended the death of Jennifer Slagle or any other person. The most that could be said concerning defendant's culpability for Jennifer's death is that defendant knew his partner was armed, and may have contemplated that in an unexpected confrontation Perez would shoot and someone might be killed. The same can be said of Enmund; yet his knowledge that his codefendants were armed and prepared to kill did not prevent the United States Supreme Court from concluding that imposition of the death penalty on Enmund was unconstitutional.

*Enmund* v. *Florida* makes clear that an accomplice who neither intends to kill nor contemplates the use of lethal force cannot be sentenced to death. It necessarily follows that the evidence presented at defendant Carlos' preliminary hearing is insufficient to hold him for trial on a capital charge. The district attorney tacitly acknowledges this constitutional barrier, and has informed us that he will not ask for the death penalty in the Carlos trial.

■ The holding in *Enmund* was carefully limited to the case of a defendant who did not kill, attempt to kill, or contemplate that life would be taken. The reasoning of the case, however, raises the question whether the death penalty can be imposed on anyone who did not intend or contemplate a killing, even the actual killer. The court's analysis of the deterrent and retributive purpose of the death penalty focuses on the subjective intent and moral culpability of the defendant, and in this context there is no basis to distinguish the killer from his accomplice. The threat of capital punishment is unlikely to deter an accidental or negligent killing, and in terms of moral responsibility for an unintended homicide, all participants in the underlying felony would seem equally culpable. Consequently, the question whether the felony murder special circumstance can constitutionally be applied to any defendant, including the actual killer, who did not intend or contemplate

a killing appears a substantial and yet unsettled constitutional issue under the Eighth Amendment.[18]

Furthermore, a new set of constitutional issues arises when we consider that the 1978 initiative imposes a maximum penalty of life imprisonment with possibility of parole for a wilful and premeditated killing that does not come within any listed special circumstance. If the initiative were construed to impose a penalty of death or life imprisonment without parole for unintended felony murder, it would punish more severely a defendant who did not intend to kill than one who did. Such a distinction would create problems under both the Eighth Amendment and the equal protection clause.

■ Decisions under the Eighth Amendment have established that a state cannot impose the death penalty for all murders (*Woodson* v. *North Carolina* (1976) 428 U.S. 280 [49 L.Ed.2d 944, 96 S.Ct. 2978]; *Roberts* v. *Louisiana* (1976) 428 U.S. 325 [49 L.Ed.2d 974, 96 S.Ct. 3001]), nor give the jury uncontrolled discretion to select which defendants suffer that penalty (*Furman* v. *Georgia, supra,* 408 U.S. 238 [33 L.Ed.2d 346]). Instead, it must develop standards to guide the decision of the jury, selecting from among the murder victims those aggravated cases in which the death penalty would be appropriate. "A capital sentencing scheme must . . . provide a 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not.'" (*Godfrey* v. *Georgia* (1980) 446 U.S. 420, 427 [64 L.Ed.2d 398, 406, 100 S.Ct. 1759], quoting *Furman* at p. 313 [33 L.Ed.2d at p. 392] (White, J., conc.).)

■ We doubt that a screening device which included those who killed accidentally, while excluding some intentional killers, would meet the United States Supreme Court's test. Arguably the California procedure might be saved by the power of the jury to reject the death penalty after finding a felony murder special circumstance on the ground that the mitigating factors (which would include the absence of an intent to kill) outweigh the aggravating factors. (See *Jurek* v. *Texas* (1976) 428 U.S. 262 [49 L.Ed.2d 929, 96 S.Ct. 2950].) The jury, however, would still have the power to impose a death sentence in such a case, and even if it rejected that penalty, the defendant would still receive a more severe sentence than the deliberate murderer who committed no underlying felony.

The language from *Godfrey* v. *Georgia* indicates that the Eighth Amendment requires a "meaningful basis" (446 U.S. 420, 427 [64 L.Ed.2d 398,

---

[18]In *Lockett* v. *Ohio* (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954], Justice White, author of the *Enmund* opinion, stated in a concurring opinion that it "violates the Eighth Amendment to impose a penalty of death without a finding that the defendant possessed a purpose to cause the death of the victim." (P. 624 [57 L.Ed.2d at p. 1002].)

406]), a "principled way" (p. 433 [64 L.Ed.2d at p. 409]), to distinguish capital from noncapital murders. The equal protection clause may require more. We deal with a classification affecting the express, fundamental right to life itself. Liberty is also a fundamental right, and one can conceive of no greater abridgment of liberty than a sentence of life imprisonment without possibility of parole. Consequently, the state might have to show that the classification established by the 1978 initiative is necessary to achieve a compelling state interest. (See *People* v. *Olivas* (1976) 17 Cal.3d 236, 251 [131 Cal.Rptr. 55, 551 P.2d 375]; *In re Maurice S.* (1979) 90 Cal.App.3d 190, 193 [153 Cal.Rptr. 317].)

Even under this stringent standard the state may well be able to justify treating a deliberate felony murder as more serious than a deliberate murder unrelated to a felony. But it is doubtful that it could explain treating an unintended felony murder as an offense more serious than wilful nonfelony murder. As the court explained in *Enmund,* the state's interest in deterrence and retribution does not warrant a death penalty for a defendant who did not intend to kill (see 458 U.S. 782, 801 [73 L.Ed.2d 1140, 1154, 102 S.Ct. 3368, 3378]) and it is difficult to conceive of any other interest that might justify such a result.[19]

We need not decide whether the felony murder special circumstance of the 1978 law, if lacking an intent to kill requirement, would be unconstitutional on its face or as applied. (*Enmund* makes it clear that imposing the death penalty on accomplices who did not intend or contemplate a killing is unconstitutional, but the other constitutional issues discussed in this opinion remain open questions.) It is sufficient to note that substantial constitutional questions can be avoided by a construction of the enactment to require a showing of intent to kill as an element of the special circumstance. Under established rules of construction, we should adopt that view of the law which steers clear of constitutional obstacles and leaves no doubt of the statute's validity.

The district attorney argues that although the constitutional principles may demand an intent to kill requirement before imposing the death penalty, the

---

[19]The dissenting opinion misses the point when it asserts that "[i]n an age when the state and nation are awash with murders and violent felonies, it is within the power of the Legislature or the people themselves to judge which felonies are deemed more serious and to include only those offenses within the felony murder special circumstances statute." (*Post,* at p. 159.) We do not question the power of the Legislature to decide which felonies to list in the felony murder special circumstances; to decide, for example, to include robbery and kidnaping but not counterfeiting or sale of narcotics. But there is a serious question, and one the dissent ignores, whether the Legislature could rationally decide that any of the listed felonies presents a greater risk of death than intentional premeditated murder. Yet the 1978 initiative, as construed by the dissent, would punish an unintentional killing—even an accidental killing—during a listed felony more severely than some premeditated murders.

initiative could be "severed," and the lesser penalty of life imprisonment without possibility of parole imposed upon defendants who did not intend to kill. The argument misses the mark on several counts. First, the statutory language cannot reasonably be construed to impose different requirements for a special circumstance finding depending upon whether the prosecutor seeks, or the jury returns a death penalty. While we could interpret the statute to permit a special circumstance finding without intent to kill, then hold the law unconstitutional whenever such a finding leads to a death penalty, a holding of partial invalidity is inferior to a construction which sustains the statute in all its applications.

Second, the construction proposed by the district attorney does not avoid all constitutional issues. It would still leave some defendants who did not intend to kill with a minimum sentence of life without possibility of parole, while leaving others who killed deliberately with a maximum sentence that permitted parole. The state would still bear the burden of justifying this classification, and it is doubtful whether it could meet that burden.

Finally, as we recently explained in *People* v. *Spears, supra,* 33 Cal.3d 279, "the entire procedural scheme for disposition of a charge of special circumstances [under the 1978 initiative] . . . 'is properly restricted to cases involving adults charged with first degree murder and subject to the death penalty.'" (Pp. 282-283, quoting *People* v. *Davis* (1981) 29 Cal.3d 814, 831 [176 Cal.Rptr. 521, 633 P.2d 186].) If a defendant is not subject to the death penalty, then under the reasoning of *Davis* and *Spears* he is not subject to special circumstance proceedings and cannot be sentenced to life imprisonment without possibility of parole.[20]

III. *Conclusion.*

The wording of the initiative, its purpose as explained to the voters, the principle that penal statutes should be construed to give the defendant the benefit of reasonable doubt, and the companion principle that statutes should be construed to avoid substantial questions of their constitutional validity—all unite to support the conclusion that the felony murder special circumstance of the 1978 initiative requires proof that the defendant intended to kill. Specifically, we construe the word "intentionally" in subdivision (b) of section 190.2 to apply to all defendants—actual killers and accomplices

---

[20]The dissent, in claiming that we misapply *Spears* and *Davis,* overlooks language in both opinions which makes it clear that the special circumstance procedures of the 1977 and 1978 laws apply only to defendants eligible for the death penalty. The dissent's further reference to the severability provision of the 1978 enactment is unavailing; the dissent suggests, and we can find, no severable language in that initiative which when deleted would leave the balance free of constitutional difficulties.

alike—and to require an intent to kill before a defendant is subject to a special circumstance finding under paragraph 17 of that section.

Since the evidence presented at the preliminary hearing in the present case is plainly insufficient to establish reasonable cause to believe defendant intended to kill the victim or any other person, defendant cannot be tried on a felony murder special circumstance allegation. Let a writ of prohibition issue barring respondent court from conducting further proceedings against defendant on the special circumstance allegation in count I of the information.[21]

Bird, C. J., Mosk, J., Kaus, J., Reynoso, J., and Karesh, J.,* concurred.

**RICHARDSON, J.**—I respectfully dissent.

The majority, purportedly troubled by "serious constitutional questions" regarding a provision of the 1978 death penalty statute (Pen. Code, § 190.2, subd. (a)(17)), attempts to "avoid" those questions by rewriting the statute. (See *ante*, p. 147.) Apart from the obvious impropriety in our redrafting of an unambiguous statute regarding the appropriate penalties for criminal offenses, with due deference, I find numerous other errors in the majority's analysis.

### 1. Defendant's Lack of Standing

It seems apparent to me that defendant lacks standing to raise any constitutional challenge which is based on the impropriety of exacting the death penalty for an unintentional felony murder. *Defendant does not face the death penalty, and no one contends that he does.* As an accomplice who neither personally killed nor intended to kill the victim, he is exempt from the death penalty under *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368]. Nevertheless, the majority opinion contains an extended discussion of various theoretical constitutional objections to imposing the death penalty for an unintentional killing. Such discussion, in my view, is unnecessary and inappropriate.

Because defendant herein does not face the death penalty, we have no occasion to discuss the constitutional propriety of that penalty. Moreover,

---

[21]We do not decide whether this decision will apply retroactively to cases already tried, nor do we determine what test of prejudice controls in a case in which the court erroneously failed to instruct on the necessity for intent to kill in a felony murder special circumstance under the 1978 initiative. Such questions of retroactivity and prejudice, being unnecessary to the decision of the present case, have not been briefed or argued by the parties; we therefore defer resolution of those questions to a later case.

*Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.

by reason of the majority's misapplication of the holding in *People* v. *Spears* (1983) 33 Cal.3d 279 [188 Cal.Rptr. 454, 655 P.2d 1289], discussed in part 2 hereof, this defendant *no longer faces even a lesser sentence of life imprisonment without parole. (Ante,* pp. 153-154.) It is my view that the *Enmund* rule, plus *Spears,* make it entirely inappropriate to discuss, as the majority does at length, whether death or life imprisonment without parole properly may be imposed in the absence of proof of an intent to kill. *Enmund* forbids imposing death for persons who neither kill nor intend to kill, and *Spears* precludes imposing life imprisonment without parole in any case where the death penalty is not an available sanction. The remaining discussion is dictum.

### 2. *Misapplication of People* v. *Spears*

The majority in *Spears, supra,* held that because *minors* are statutorily exempt from the death penalty (§ 190.5), the Legislature likewise intended to exempt them from the lesser penalty of life imprisonment without parole. The *Spears* majority believed that the death exemption in section 190.5 disclosed an intent to preclude operation of the entire special circumstances statute with respect to minors. (While I disagreed with the *Spears* analysis, I concurred in the judgment under the compulsion of our earlier holding in *People* v. *Davis* (1981) 29 Cal.3d 814 [176 Cal.Rptr. 521, 633 P.2d 186].)

The present case involves neither a minor nor a statutory exemption from the death penalty. Defendant herein avoids that penalty only because of the *Enmund* decision. The high court has nowhere suggested, however, that the lesser penalty of life imprisonment without parole was similarly precluded. Nevertheless, the majority now holds that, simply because defendant is constitutionally exempt from the death penalty, he likewise cannot be sentenced even to the lesser penalty. I think this is wrong.

Unlike *Spears,* where the legislation itself exempted minors from the death penalty, and some uncertainty may have existed regarding legislative intent, in the case before us section 190.2, subdivision (a), expressly and unambiguously requires the imposition of *either* death or life imprisonment without parole, and no other penalty, for a first degree murder committed during a robbery. The intent to impose either one of these two penalties (and no lesser penalty) is absolutely clear. A subsequent judicial ruling which has precluded imposition of the greater penalty does not affect the propriety of exacting the lesser.

Moreover, the 1978 death penalty law contains a detailed and comprehensive severability clause which would preserve the lesser penalty even if imposing the death penalty is unconstitutional as applied to an unintentional

felony murder. (See *People* v. *Superior Court* (*Colbert*) (1978) 78 Cal.App.3d 1023, 1028 and fn. 3 [144 Cal.Rptr. 599].) The severability provisions (§§ 13, 14 of Initiative Measure approved on Nov. 7, 1978, 47 West's Ann. Pen. Code (1983 Cum. Supp.) foll. § 190, p. 178; Deering's Ann. Pen. Code (1982 Supp.) p. 133), could be readily applied to delete all references to the death penalty as an alternative to life imprisonment without parole in cases to which *Enmund* applies. For example, section 14 of the initiative measure recites that if any application of the initiative to any person is held invalid as to a defendant sentenced to death, that defendant "will instead be sentenced to life imprisonment . . . without the possibility of parole." If such a severance can occur following trial and sentence, a fortiori, it can occur prior to trial. The people's intent to preserve and apply the lesser penalty despite the invalidity of the greater one appears manifest.

### 3. *Misinterpretation of Section 190.2*

The majority, in rewriting section 190.2, subdivision (a)(17), to "avoid" constitutional problems, concludes that application of the "felony murder special circumstances" is limited to those persons "who intend to kill or aid in a killing." (*Ante,* p. 145.) Again, with respect, this interpretation is patently incorrect, adding, as it does, an element of intent which the sovereign people specifically *deleted* from prior law by adopting the 1978 initiative measure.

The now repealed 1977 death penalty statute expressly required proof that the defendant, "with intent to cause death," committed a "willful, deliberate, and premeditated" murder during the commission or attempted commission of various enumerated felonies. (Former § 190.2, subd. (c)(3).) The 1978 law, however, contains no such qualification, requiring only that the defendant be found guilty of a first degree murder "committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit" nine enumerated dangerous felonies (§ 190.2, subd. (a)(17)). It is elementary that when existing law is amended by deleting an express provision of the previous statute, we must presume that a change in the law was intended. (E.g., *People* v. *Schmel* (1975) 54 Cal.App.3d 46, 51 [126 Cal.Rptr. 317].) *Conclusive* evidence of such an intent is contained in the language setting forth the remaining special circumstances under section 190.2, subdivision (a): Ten of these provisions *expressly* require that the killing be an "intentional" one, a word conspicuously absent from the felony murder special circumstance. Thus, it seems inescapable to me that neither the drafters of the 1978 initiative measure nor the voters who adopted it intended that subdivision (a)(17) of section 190.2 would be limited to persons who intend to kill or aid in a killing.

The majority, however, rejects an interpretation of the statute which would permit imposition of the death penalty for "accidental" killings, stressing that such a law "would be a momentous step, raising grave moral questions." (*Ante,* p. 145.)

There are at least four difficulties with such a generalized observation:

First, as previously noted, the death penalty is not sought in this case.

Second, the record discloses that the victim was probably shot during a gunfight between defendant's accomplice and a deputy sheriff. At this pretrial stage of the case, we cannot simply assume that the killing was either "accidental" or unintentional.

Third, we have no power whatever to rewrite *unambiguous* penal statutes which fail to comport with our own personal views of "morality." These judgments are to be made by the people, not this court.

Fourth, there is nothing "momentous" about a statute which permits imposition of the death penalty for accidental killings occurring in the course of the commission of a dangerous felony. Prior to 1973, when the Legislature first added the now deleted requirement of a "willful, deliberate, and premeditated" felony murder, the California statutes authorized routine imposition of the death penalty for *any* first degree murder (former § 190, enacted 1872), which included an accidental felony murder under section 189.

The majority points to certain supposed anomalies which conceivably might arise if we interpreted and applied section 190.2, subdivision (a)(17), as it is presently written. As I explain in a subsequent portion of this opinion, we cannot and should not demand absolute perfection or equality of treatment in an area as inherently dependent upon subjective value judgments as criminal punishment. But even assuming that injustices conceivably might occur, that fact does not afford a sound basis for rewriting an *unambiguous* statute. As previously explained, unlike many of the other statutory special circumstances, and unlike the 1977 predecessor law, the present provision does not require proof of an "intentional" or "willful" or "premeditated" or "deliberate" murder. Thus, no purpose is served by the majority's protracted attempts at finding possible anomalies in the law we are sworn to uphold and apply *as written.*

The majority relies on the ballot arguments regarding the initiative measure (Prop. 7, Gen. Elec. (Nov. 7, 1978)) which contained the provision at issue herein. Those arguments seem wholly inconclusive. As the majority

acknowledges, the opponents of the measure construed it as permitting imposition of the death penalty for an unintended killing. (*Ante,* p. 144.) Contrary to the majority, however, the proponents' rebuttal argument did not dispute this interpretation as applied to the actual killer, but only as applied to the *accomplice* (the "poor lender" of a screwdriver used by someone else in a murder). Nowhere do the proponents suggest that the murderer himself must have intended to kill his victim in order to justify imposition of the death penalty or life imprisonment without parole.

It is unnecessary to discuss the majority's interpretation of the accomplice provisions of the 1978 law (§ 190.2, subd. (b)), because the *Enmund* case, *supra,* 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368] mandates the existence of an intent to kill or assist in a killing before the death penalty constitutionally may be imposed upon an accomplice. And under both the majority's misapplication of *People* v. *Spears, supra,* 33 Cal.3d 279, and its editing of section 190.2, subdivision (a)(17), the lesser penalty of life imprisonment *without parole* likewise becomes unavailable notwithstanding proof of special circumstances.

## 4. *Constitutionality Under the Federal Constitution*

Does there exist any constitutional impediment to imposing either death or life imprisonment without parole upon one who kills during a dangerous felony, in the absence of proof of an intent to kill?

With due respect, I find wholly unconvincing the majority's analysis of the "serious constitutional questions" which would arise were we to construe section 190.2 as it is written. In *Enmund, supra,* the high court strongly suggested that *either* an intent to kill *or* personal involvement in the killing would be sufficient to justify imposing the death penalty in a felony murder case. Thus, *Enmund* held that the Eighth Amendment does not permit *imposing that penalty* "on one such as Enmund who aids and abets a felony in the course of which a murder is committed by others *but who does not himself kill,* attempt to kill, *or* intend that a killing take place or that lethal force will be employed." (Italics added, 458 U.S. at p. 797 [73 L.Ed.2d at p. 1151, 102 S.Ct. at pp. 3376-3377].) As the court explained, "*Enmund did not kill or intend to kill* and thus his culpability is plainly different from that of the robbers who killed; yet the state treated them alike . . . ." (Italics added, *id.,* at p. 798 [73 L.Ed.2d at p. 1152, 102 S.Ct., p. 3377].) Thus, the states may continue to punish with death (and certainly with life imprisonment without parole) those persons who, in the course of committing a dangerous felony, actually kill someone, whether or not they actually intended the killing to occur.

Can there be any doubt that imposition of such punishment under such circumstances has a rational penological basis? The purpose underlying the felony murder special circumstances provision is perfectly obvious. It was and is to deter felons from using deadly weapons or deadly force, or taking other action likely to result in death, by severely punishing the commission of those dangerous felonies which actually result in a killing. The fact that some intentional murders may be punished less severely certainly does not invalidate the challenged statute: "[A]symmetry in the scale of penalties arouses constitutional alertness but breaches the cruel and unusual punishment clause only if it lacks a rational basis." (*In re Maston* (1973) 33 Cal.App.3d 559, 565 [109 Cal.Rptr. 164] [life imprisonment without parole for aggravated kidnaping is constitutional form of punishment despite lesser penalty for premeditated murder]; see *People* v. *Crane* (1983) 142 Cal.App.3d 92, 101-103 [190 Cal.Rptr. 785]; *People* v. *Noble* (1981) 126 Cal.App.3d 1011, 1018-1021 [179 Cal.Rptr. 302].) In an age when the state and nation are awash with murders and violent felonies, it is within the power of the Legislature or the people themselves by initiative to judge which felonies are deemed more serious, and to include only those offenses within the felony murder special circumstances statute. The present classification and identification of these felonies are abundantly reasonable.

In sum, given *Enmund*'s strong implication that one who personally kills while committing a dangerous felony constitutionally may be subject to the death penalty, any "serious constitutional questions" are illusory with respect to the provision at issue here.

## 5. *Conclusion*

The majority by interpretation has recast the 1978 death penalty law in a manner which effectively nullifies the felony murder special circumstances provision, thereby requiring reversal and retrial of numerous cases presently pending on appeal before this court and the Court of Appeal. In doing so, the majority has ignored sound principles of statutory interpretation and constitutional law, and has thwarted the people's will in their adoption of the 1978 law.

Several years ago, in an opinion which invalidated as unconstitutional the 1973 mandatory death penalty statutes, we declined the People's invitation to rewrite those statutes in a manner which might pass constitutional muster. (*Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420, 444-445 [134 Cal.Rptr. 650, 556 P.2d 1101].) We stated in *Rockwell* that "They [the People] ask us not to interpret, but to rewrite the law in a manner which we have shown to be contrary to the manifest legislative intent in enacting [former] sections

190 through 190.3. Decisions as to which criminal defendants shall suffer the death penalty . . . are matters of legislative concern." (P. 445.)

In my view, the majority has either forgotten or ignored *Rockwell's* lesson. We should not attempt to rewrite the felony murder special circumstances statute in a manner wholly alien to the manifest intent of those who drafted it, and the people who adopted it. It is as unwise as it is unnecessary.

I would deny the writ.

The petition of real party in interest for a rehearing was denied January 19, 1984.